PLANT INDUSTRIES, INC., Plaintiff,

v.

Robert B. BREGMAN, Malcolm A. Borg, Connie A. Cox, Alan M. Morrison, Serge C. Naggar and Thomas E. Singer, Defendants.

No. 80 Civ. 2577.

United States District Court, S. D. New York.

May 19, 1980.

Willkie, Farr & Gallagher, New York City, for plaintiff; Stephen Greiner, John S. D'Alimonte, John M. McEnany, Brian E. O'Connor, New York City, of counsel.

Wender, Murase & White, New York City, for defendant Robert B. Bregman; Peter J. Gartland, Lance Gotthoffer, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Plant Industries, Inc. ("Plant") commenced this action on May 7, 1980 seeking injunctive relief for violations of section 14(a) of the Securities Exchange Act of 1934[1] and two of the rules promulgated thereunder which regulate the solicitation of proxies. These violations were allegedly committed by the defendants, the members of the Plant Industries Committee for New Management (the "Committee") in the course of a proxy fight they are now waging against Plant's current management and directors with regard to the election of

---

1. 15 U.S.C. § 78n(a).

directors at the annual meeting of the Plant shareholders to be held on May 21, 1980. Plaintiff initially moved for a preliminary injunction to enjoin the defendants from voting at the forthcoming meeting (1) any proxies they have received or will receive and (2) any shares of Plant stock they themselves own beneficially or of record.[2]

Upon the argument of this motion, which occurred while the Court was conducting a rather complicated trial, the Court suggested the parties agree to a reasonable adjournment of the scheduled shareholders' meeting to permit consideration of the matter free from undue pressures. Their attempts to agree upon a form of a letter explaining the reasons for the adjournment failed whereupon the Court indicated it would hand down its ruling before the scheduled meeting. Plaintiff has modified its request for preliminary relief. It now seeks to enjoin the defendant Bregman from continuing alleged violations of the proxy rules and to require Bregman to send shareholders a letter of resolicitation and a statement correcting alleged material misstatements and advising them of alleged violations of Rule 14a-3, in which event plaintiff will agree to the adjournment of the meeting so as to permit Bregman to resolicit properly.

Since the parties have not agreed upon an adjournment of the scheduled meeting and defendant has not conceded any violations, the Court is perforce required to dispose of the matter under existing circumstances. After careful consideration of the affidavits, depositions and briefs submitted, the Court concludes that plaintiff's application is without evidential support—that its motion is grounded upon such speculation, conjecture and surmise as to require its denial.

In large measure, the application is founded upon disputed conversations and events which are not specified and from which plaintiff seeks to draw unreasonable inferences as to what the actual facts are.

The defendant Robert Bregman was an employee of Plant from February 1978 until January 21, 1980. He is a substantial shareholder in the plaintiff. While at Plant, Bregman became increasingly dissatisfied with the company's current management, particularly with its president, Hyman Katz, incidentally, his father-in-law. Sometime in late December 1979, Bregman's disenchantment culminated in a decision to take some action to have Katz removed. He approached each of the directors of Plant with a proposal that the board take such action. This approach was unsuccessful, Katz apparently learned of it, and Bregman was discharged on January 21, 1980. Bregman retained counsel a day or two later, formed the Committee and initiated the present proxy fight seeking to unseat the Katz-led board of directors. On February 15, 1980, Bregman filed Schedules 14B and 13D with the Securities and Exchange Commission.[3] On April 23, 1980 the Committee sent out its proxy materials, consisting of a proxy statement and a letter outlining the Committee's position.

The standards in this Circuit for preliminary injunctive relief are well-established. Plaintiff must show (a) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the plaintiff; and (b) in either case, irreparable injury.[4]

---

**2.** On May 7, 1980 Plant moved for discovery preparatory to its motion for a preliminary injunction. This motion was granted with the defendants' consent on condition that discovery take place expeditiously and plaintiff make its motion returnable by May 13th. Pursuant to this arrangement Plant deposed only the defendant Robert B. Bregman, chairman of the Committee, and Robert Shore, a registered representative with Bear, Stearns.

**3.** See 17 C.F.R. §§ 240.14a–102, 240.13d–101 (1979). See also 17 C.F.R. §§ 240.14a–11(c), 240.13d–1 (1979).

**4.** Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co., 604 F.2d 755, 758–59 (2d Cir. 1979); Seaboard World Airlines, Inc. v. Tiger Intern., Inc., 600 F.2d 355, 359 (2d Cir. 1979) (quoting Jackson Dairy Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)).

*The Merits of Plaintiff's Claims.*

The complaint in this action contains two causes of action. One alleges violations of Rule 14a–3,[5] promulgated under section 14(a), claiming specifically six instances of allegedly unlawful solicitations by Bregman on behalf of himself and the Committee. For the purposes of this motion, however, plaintiff presses only one of these claims— that Bregman improperly solicited the support of several stock brokers. The second count alleges violations of Rule 14a–9,[6] promulgated under section 14(a), in that the Committee's proxy materials are materially false and misleading with regard to seven distinct items. Plaintiff presses only two of these allegations, conceding that it does not have sufficient evidence to support the others at this time.

1. Alleged Violations of Rule 14a–3.

██ Rule 14a–3[7] prohibits the solicitation of a proxy "unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A."[8] This rule does not apply to a non-management solicitation where the total number of persons solicited is ten or fewer,[9] and in an election contest, the rule does not apply provided the person making the solicitation has previously filed a Schedule 14B[10] with the S.E.C. and certain other requirements have been met.[11] In light of this second exception, plaintiff challenges only solicitation activities it claims took place prior to February 15, 1980, the date the defendants filed their Schedule 14B.

To show that there is a likelihood it will succeed on the merits of its Rule 14a–3 claims or that it has raised sufficiently serious questions going to the merits, plaintiff maintains that the evidence it has submitted warrants the conclusion that there is a "substantial probability" that Bregman "solicited support from at least several registered representatives" prior to the filing of the Schedule 14B. Plaintiff points first to contacts Bregman admittedly had with certain friends and acquaintances who were members of the securities industry— Strauss, Spiewak, Shore and Sidel—while he was still a Plant employee prior to January 21, 1980 and to his simple statement that "a lot of brokers called" him at Plant. It also refers to the affidavits of two Plant directors—Goldfeld and Fritz—whom Bregman sought to persuade to join him in his efforts to oust Katz before he was fired. Fritz states that Bregman told him he controlled 60% of Plant's stock and Goldfeld states that Bregman told him that he controlled one and a half million shares, that he had spoken with his friends who were brokers and that they had said they would support Bregman. Bregman denies that he made any such statement to Goldfeld and avers he told Goldfeld only that he "knew where the stock was" in response to his inquiry as to what support he had. Thus there is a clear issue of fact as to what was said at this meeting.[12]

Aside from this disputed statement, there is no proof that Bregman ever discussed a proxy fight with the brokers he spoke to, let alone that he actively solicited their support. Plaintiff's position is based on assumption upon assumption. It reasons that Bregman would not have taken his case to the board, jeopardizing his job, unless he knew he had "firm support" from brokers, and then infers from this initial assumption that Bregman had in fact solic-

---

5. *See* note 7 *infra* and accompanying text.

6. *See* note 15 *infra* and accompanying text.

7. 17 C.F.R. § 240.14a–3(a) (1979).

8. 17 C.F.R. § 240.14a–101 (Schedule 14A) (1979).

9. Rule 14a–2(a), 17 C.F.R. § 240.14a–2(a) (1979).

10. 17 C.F.R. § 240.14a–102 (Schedule 14B) (1979).

11. Rule 14a–11(d), 17 C.F.R. § 240.14a–11(d) (1979).

12. *See Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 763 (2d Cir. 1979).

ited those brokers and obtained their support before he went to the board. It makes still another assumption that the brokers would not have indicated their support without having previously solicited their customers in support of Bregman.

This chain of logic is constructed of the most tenuous links—it is without support in the record and the inferences plaintiff seeks to draw are sheer speculation. Bregman's unrefuted deposition reveals that his contacts with the brokers who followed Plant's stock were, on the whole, initiated by them and were proper inquiries of Bregman about general matters pertaining to Plant's business. It also reveals that Bregman was extremely disgruntled with Plant's management and that, while not a wealthy man, Bregman possesses substantial assets (over $200,000) and a trade. These facts undermine plaintiff's contention that Bregman would not have jeopardized his position at Plant without first obtaining the brokers' support.

The next arguments made by plaintiff to support its claim of Rule 14a–3 violations involve contacts Bregman had with certain brokers after he left Plant on January 21st. Bregman testified that he had conversations with Sidel and Strauss in which he read them a press release issued by Plant on Selvac, a key product, the development of which was of special interest to the brokers. These conversations had no relation to the proxy fight; Bregman states in fact that he told neither man of his own dissatisfaction with Katz' performance. Plaintiff, however, after first fixing the date of these conversations as subsequent to Bregman's departure from Plant, concludes, solely from the fact that by that time Bregman was considering a proxy fight and had retained counsel, that "it is simply not credible" that Bregman did nothing but read them the press release. It urges the inference is warranted that what in fact Bregman did was to solicit their support for his slate. Again, this inference is unwarranted; it is pure guesswork, utterly without a factual basis in the record.[13] Although afforded the opportunity, plaintiff deposed neither Sidel nor Strauss.

The final "proof" of solicitation upon which plaintiff relies is a handwritten memorandum of a conversation with Hal McGuire, a registered representative of Shearson Loeb Rhodes, dated January 23, 1980 (prior to the filing of the Schedule 14B). The memo indicates Bregman spoke to McGuire about the possibility that someone named Eli Rabb might be interested in serving on Bregman's opposition slate of directors. Plaintiff contends that the memo "make[s] plain" that Bregman solicited McGuire's support by that date because "he certainly would not have asked McGuire [for assistance in obtaining Rabb for the slate] unless on that occasion or previously he solicited McGuire's support." This conclusion is a non sequitur and is without an iota of factual support in the record. In this instance too, no attempt was made to depose McGuire and instead plaintiff chose to speculate on what was said. Particularly in light of Bregman's numerous acquaintances in the securities industry, there is absolutely no reason that his request for assistance in approaching a potential board member must inevitably have been preceded by a solicitation of support.

In sum, to prove that it can make out its claim of improper solicitations on the merits, plaintiff proffers a few seemingly innocent communications by Bregman with members of the brokerage community and seeks to bolster them into unlawful activity by inferences that are unsupported by reason or the record. Accordingly, with respect to the Rule 14a–3 claims, plaintiff has failed to develop an adequate factual predicate to show a likelihood of success on the merits or to raise sufficiently serious questions going to the merits to constitute fair ground for litigation.

13. In fact, an opposite inference may be drawn from one of the very factors plaintiff urges to support its position—the fact that Bregman had contacted counsel about his plans prior to the claimed date of the conversations. His attorneys cautioned Bregman about pre-filing solicitations and it is reasonable to conclude that, so warned, he obeyed these instructions.

Assuming that plaintiff had shown a sufficient factual base to conclude that Bregman had sought the support of the brokers he spoke to, the Court nonetheless would conclude that its legal position failed to meet the standard for preliminary relief. Plaintiff takes the position that any solicitation of brokers by Bregman is not within the proxy rule exception for solicitations of under ten persons [14] because the solicitation of brokers must be construed as the solicitation of the brokers' customers—who number more than ten. This must be the case, plaintiff argues, because the brokers are in a position to influence their customers and Bregman would not have solicited the brokers unless he thought they could influence their customers. Plaintiff's argument is without substance. It concedes that there is no authority for such an interpretation of the proxy rules. Thus the ultimate success on the merits of its solicitation claims depends on the resolution in its favor of a completely unprecedented question of law. In such circumstances, it cannot be concluded that plaintiff has shown a likelihood of success on the merits.

### 2. Alleged Violations of Rule 14a–9.

■ To prevail on its Rule 14a–9 [15] claims, plaintiff must prove (1) that the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary to make the statement not false or misleading and (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct.[16]

The Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*,[17] stated the now classic standard of materiality under Rule 14a–9; a misstatement or omission is material

if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. [This standard] does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

In determining whether a statement or omission is false or misleading, the proper standard is "[f]air accuracy, not perfection." [18] As the Court of Appeals has aptly stated: "Rare indeed is the proxy statement whose language could not be improved upon by a judicial craftsman sitting in the serenity of his chambers. This is

---

**14.** *See* note 9 *supra* and accompanying text.

**15.** 17 C.F.R. § 240.14a–9(a) (1979) provides: No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

**16.** *See Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F.Supp. 787, 791 (S.D.N.Y.1978); *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F.Supp. 951, 956 (S.D.N.Y.), *aff'd in part, rev'd in part*, 584 F.2d 1195 (2d Cir. 1978). A third element—that the proxy solicitation was an essential link in effecting the proposed corporate transaction—can be assumed to have been met where the challenged transaction is the election itself. *Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654 (2d Cir. 1979); *Berkman, supra*, 454 F.Supp. at 793.

**17.** 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See also Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650 (2d Cir. 1979).

**18.** *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978); *Laurenzano v. Einbender*, 448 F.2d 1, 6 (2d Cir. 1971).

particularly so where the statement is prepared in the 'hurly-burly' of a contested election. '[N]ot every corporate counsel is a Benjamin Cardozo . . .', and nit-picking should not become the name of the game." [19]

Plaintiff claims that the letter to shareholders accompanying the Committee's proxy statement contained two statements that were materially false and misleading, in violation of Rule 14a–9. The first statement was:

> The Company's independent auditors have found it necessary to qualify their opinion of the Company's financial statements for each of the past ten years, although when Mr. Katz first took over the accountants' opinions were unqualified. Such qualifications relate to litigation, and the recoverability of costs represented by property, plant, equipment, inventory, research and development, production start-up and market development expenses, which costs appear as assets on the Company's balance sheets.

Plaintiff concedes the truth of the first sentence quoted. Plant's financial statements have in fact been qualified in each of the past ten years. It also admits that in each of those years the reasons for the qualified statements were one or more of the items given in the second sentence from the Committee's letter. Plaintiff nonetheless contends that this statement is materially misleading because of the "clear and intended" implications it finds in it that, for *each year* referred to, *each* listed category was a reason for the accountants' qualification, and that Plant's costs for research and development, production start-up and market development were listed as assets in the financials in *each* of the past ten years. These implications are false, Plant claims, because after 1974 none of the qualifications related to research and development costs and after 1975, none related to production start-up and market development.

Simply put, Plant's claim with respect to the qualifications statement is a clear instance of "nit-picking." The fact is the financials were qualified in each year and for one or more of the reasons given. The implications urged by the plaintiff that there were qualifications in *each* year relating to *each* specific category reflect a strained and unnatural reading of the language. Moreover, given the literal accuracy of the Committee's language and the undisputed truth of the basic charge made in the statement, it is seriously to be doubted that the disclosure of a list attributing reasons for the qualifications year by year would have "significantly altered the 'total mix' of information" available to the shareholders. Thus the Court concludes that the statement quoted above is not misleading; but assuming *arguendo* the implications urged by plaintiff are found in the language, there is no substantial likelihood a reasonable shareholder would consider important in deciding how to vote the fact that, while there were qualifications to the financial statements in all years, they did not relate to each of the categories in each year. Moreover, it should be noted that plaintiff, in a communication to the shareholders, has already apprised them that the qualifications in certain years did not apply to certain categories.

The second statement in the Committee's letter complained of by Plant says:

> The Katz-led board has caused our Company to lose in excess of $14,250,000 before taxes on these three businesses, none of which, through last year, had contributed one thin dime to Company earnings before income taxes and extraordinary items.

One of the three "businesses" referred to is Plant's "Synthetic Woven Fabrics" operation (which consists of the Plant subsidiary,

---

**19.** *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978) (citations omitted). *See also Seaboard World Airlines, Inc. v. Tiger Intern., Inc.*, 600 F.2d 355, 363 (2d Cir. 1979); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969) (Friendly, J.); *Ash v. LFE Corp.*, 525 F.2d 215, 221 (3d Cir. 1975); *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 267 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972).

Plant Industries (Texas) Inc.). Plaintiff alleges that the quoted statement is materially false because Plant Industries (Texas) Inc. had an "operating profit" of $320,000 for fiscal 1979 (a figure determined before allocation of general corporate expenses, research and development and interest expenses). This, however, is not the figure described in the Committee's statement which speaks of "contribut[ions] to Company earnings." Plant's own annual report contains a table which purports to show "the contribution to . . . net income [of Plant] (before provision for income taxes and extraordinary items) of the principal lines of business of the Company." This table indicates there were no such contributions from the woven synthetic cloth operation for the year ending 1979. It is from this table that the Committee derived its information and the proxy materials clearly indicate the source of its information and disclaim the accuracy of the Company's figures. The Court finds not a glimmer of a falsehood and thus no possibility of success on the merits of this Rule 14a–9 claim.

In sum, the plaintiff has also failed with respect to its Rule 14a–9 allegations to meet its burden of showing either a likelihood of success or the existence of sufficiently serious questions going to the merits to make its claims fair ground for litigation.

*Irreparable Injury.*

 Having concluded that plaintiff has not made a sufficient showing as to the merits of its claims to warrant a preliminary injunction, it is not necessary to dwell long on the question of irreparable harm.[20] The Court notes, however, that plaintiff has made no showing that irreparable injury will flow from the conduct of the defendants unless the Court grants the very drastic injunction sought here. Plant argues only that if the Committee is successful in its proxy fight but is ultimately found to

have violated the law "there *may* well be no way of fashioning effective relief" (emphasis added). This argument is without merit. To allow an election to proceed in the face of allegations of improper solicitations and misleading proxy materials does not in and of itself work an irreparable injury on the party challenging the materials.[21] The Court possesses the power, if necessary, to void the election, order resolicitation and otherwise "unscramble" this kind of transaction.[22]

In accordance with the foregoing, plaintiff's motion for a preliminary injunction is denied.

So ordered.

---

20. *See Seaboard World Airlines, Inc. v. Tiger Intern., Inc.*, 600 F.2d 355, 365 (2d Cir. 1979).

21. *Jewelcor Inc. v. Pearlman*, 397 F.Supp. 221, 252 (S.D.N.Y.1975); *D–Z Inv. Co. v. Holloway*, [1973–74] CCH Fed.Sec.L.Rep. ¶ 94,588, at 96,-061 (S.D.N.Y.1974); *Sherman v. Posner*, 266 F.Supp. 871, 873–74 (S.D.N.Y.1966). *See also*

*Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1202 (2d Cir. 1978).

22. *See Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200–01 (2d Cir. 1978).